IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,796

STATE OF KANSAS,
*Appellee*,

v.

JASON W. HACHMEISTER,
*Appellant.*

SYLLABUS BY THE COURT

1.

Under K.S.A. 2019 Supp. 60-455(b), evidence of other crimes or civil wrongs is admissible "when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." When a defendant challenges the court's admission of such evidence because its probative value is outweighed by prejudice, the defendant must demonstrate the court abused its discretion.

2.

Appellate courts use a two-step process to evaluate claims of prosecutorial error—simply described as error and prejudice. To determine if the prosecutor erred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If the court finds error, the burden falls on the State to demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility the error contributed to the verdict.

1

3.

The wide latitude afforded prosecutors to conduct the State's case does not extend so far as permitting prosecutors to argue inference upon inference or engage in speculation that exceeds reasonable inferences drawn from the evidence. An inference cannot be based on evidence that is too uncertain or speculative or that raises merely a conjecture or possibility. Any inferences made by the prosecutor must be based on admitted evidence.

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed June 5, 2020. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, argued the cause and was on the brief for appellant.

*Jodi E. Litfin*, assistant solicitor general, argued the cause, and *Derek Schmidt,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Jason W. Hachmeister was convicted of premeditated murder for killing his mother, Sheila Hachmeister. On direct appeal to this court, Hachmeister argues for reversal of his convictions because he alleges the district court abused its discretion in admitting evidence under K.S.A 60-455 and the prosecutor committed eight different errors during closing arguments. Finding only one instance of prosecutorial error, we affirm Hachmeister's conviction. The prosecutor's erroneous comment was harmless given the overwhelming evidence against Hachmeister, and this single instance of error is not enough to require a reversal for cumulative error.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2011, Hachmeister was in his mid-30s and had been living in his divorced mother's basement in Topeka for about 15 years. At 4:05 p.m. on Saturday, September 10, Hachmeister called 911 to report that he arrived home and found his mother, Sheila, lying face-down on the floor "in a pool of blood." First responders reported to the scene and found Sheila dead face down on the floor in a large pool of blood. Despite the bloody scene, law enforcement only discovered three bloody footprints inside the house with no other blood nearby. There were no signs of a forced entry; the home was not ransacked; and there were no obvious signs of robbery.

Later investigation revealed diluted bloodstains around the house. Senior Special Agent Cory Latham used a technology called leuco crystal violet (LCV) dye, which reacts with hemoglobin in blood, to discover "dilute[d] blood around the sink" in the bathroom, indicating someone "had blood on them and washed up." He also found small diluted bloodstains on the sliding glass door that went from the kitchen to the backyard; on the stairwell wall going down to the basement; and underneath the computer desk in the basement. These bloodstains all matched Sheila's blood.

Agent Latham later testified about the bloodstains at trial and also stated that the three bloody footprints appeared to be "staged" because there was no other blood around them. Agent Latham also mentioned that these footprints were made with a shoe smaller than Hachmeister's size 11 feet.

Later that night, Detective Adam Arensdorf conducted a videotaped interview of Hachmeister at the police station after visiting the scene. At this time, Hachmeister was not a suspect and Detective Arensdorf had not talked to Hachmeister about any evidence inside the house. Detective Arensdorf began by asking Hachmeister if there was anything of value in the house. Hachmeister mentioned his mother's jewelry; his $6,000 in a cash

box in his room; his computer; and his Buddha statue. A later search of the house revealed that these items were the only things missing; law enforcement had not told Hachmeister that they were missing yet. These items were never found.

While the video camera was still rolling, Detective Arensdorf stepped out of the interview room and Hachmeister's father, William, stepped in. The camera recorded their conversation. When Hachmeister was telling his father about what happened that day, Hachmeister said, "[T]hey [law enforcement] said there was a pair of footprints in there, that's why they wanted my shoes. Apparently my feet were too big for it." But, Detective Arensdorf had not talked with Hachmeister about the footprints yet.

Detective Scott Dickey—the lead detective on the case—interviewed Hachmeister again once he became a suspect. Hachmeister detailed his whereabouts on the day of Sheila's death with uncanny precision. Hachmeister said he last saw Sheila on Friday evening. The next morning, he heard Sheila moving around upstairs and she yelled down to Hachmeister that she had a headache. Hachmeister said he left the house at 11:30 to run errands and was gone until 4:00 p.m. He went to Starbucks, Dillard's, Lens Crafters, Success Vision, Kohl's, Walmart, Barnes & Noble, to visit his grandpa in assisted living, to Hy-Vee, to a gas station, and then home. Hachmeister later told Detective Dickey that his movements were caught on camera; that he wore a "traffic cone" orange shirt that they could not miss; that he saved every receipt. A text message sent by Hachmeister to Sheila also corroborated this schedule stating: "I'm going to the mall, Starbucks, and then to see Papa, so I won't be home for a few hours."

Law enforcement later tracked down individuals at these locations that came into contact with Hachmeister that day. Law enforcement found the barista that served Hachmeister at Starbucks on the day Sheila was murdered. The barista said Hachmeister was a regular and came in that day around 1:00 p.m. The barista asked Hachmeister how his day was going, and Hachmeister responded that his mother had died. The barista

4

offered his condolences. Law enforcement also talked to someone who worked at the assisted living facility where Hachmeister's grandfather lived. The employee said that Hachmeister normally said hi to her, but that day, he didn't say hi and he "looked wore out" "like he hadn't been to bed yet." Hachmeister also only stayed about 10 or 15 minutes, though he usually visited for longer periods.

Hachmeister also told Detective Dickey about a confrontation between him and his mother a day or two prior to the murder about whether he stole her wedding ring that was missing. The video of this interview was played at trial. In the video, a second detective asked Hachmeister, "Are you aware your mom thought you were stealing from her?" Hachmeister responded, "Yeah, she thought I stole a wedding ring." But Hachmeister denied taking it.

In addition to this confrontation, there was other evidence that Sheila and Hachmeister's relationship was deteriorating. At her last therapy appointment in August, Sheila had told her therapist, "Next time, I want to talk about my son." And the day before her death, Sheila spoke with her close work friend, Amy Raye, about her relationship with Hachmeister. Sheila said she had concerns about Hachmeister and was planning to ask him to move out. Sheila told Raye that Hachmeister was disrespectful and would call her a "bitch."

Hachmeister had not been working outside the home since July 2011, but he claimed to be day trading for his income. At the time of Sheila's death, Sheila had a $72,000 pay on death benefit and a $200,000 life insurance policy. After Sheila's death, Hachmeister received $36,000 from her pay on death benefit. Soon, Hachmeister's brother Aaron suspected Hachmeister was involved in Sheila's death and filed a wrongful death claim to ensure the life insurance proceeds were not paid out. This upset Hachmeister.

Just a few days after Aaron told Hachmeister that the life insurance would not be paid out because Hachmeister was a suspect, the Topeka Police Department received an anonymous "Crime Stoppers" tip stating that "two subjects out of Kansas City were involved in the death of Sheila Hachmeister" and "the two sons of Sheila were not suspects."

This was not the only anonymous tip sent about Sheila's murder. Between late September 2011 and October 2012, the Topeka Police Department received 17 anonymous, highly detailed letters about Sheila's murder from the "real killer." Importantly, at that time no details about the investigation of Sheila's murder had been made public. Some letters were handwritten; some were typed and coded (with means to decode included); and they were sent to a variety of places—for example, the Topeka Capital Journal, Hachmeister's former defense attorney, and Hachmeister's friend. Some were addressed from Hachmeister at the jail but claimed to be framing him. All of the letters were signed, "Bye-bye," a phrase Hachmeister commonly used when he left places. All of these letters were admitted into evidence at trial for the jury to read.

These letters were not only significant because they often contained information about Sheila's murders not released to the public, but the delivery of the letters also pointed to Hachmeister. For example, Hachmeister wrote to his friend, Brandon Wallace, several times in January and February 2012, after Hachmeister was jailed. One letter contained information about child pornography found on Hachmeister's computer before this information was made public. Another letter contained a second letter labeled "legal mail" within it, and Hachmeister asked Wallace to mail it for a fellow inmate. Wallace mailed this letter, and later it turned out to be one of the letters from the "real killer."

A different letter claimed the killer was someone who worked at the Shawnee County Jail, and it included a "run sheet," or print out of the jail officer shifts, as proof. Detective Dickey reviewed the videotapes from the jail and saw an officer throw a run

6

sheet away in a small trashcan; then an inmate dumped that small trashcan into a larger one; and Hachmeister later removed a document from that large trashcan and took it back to his cell.

In the months following Sheila's murder before Hachmeister was apprehended, Hachmeister visited strip clubs and drunkenly talked about his mother's murder with the dancers. One dancer testified that Hachmeister showed her a new tattoo on his arm that said, "Ich liebe dich Mutti," which means "I love you mother" in German. Hachmeister kept talking about his mother's death, even during lap dances. He said, "'I had been the prime suspect. They thought I killed her, but I didn't.'" He joked, "Oh, what's it like talking to a serial killer? No I'm just kidding." The dancer later called the police because she was alarmed by how much he brought up his mother's murder. She recalled that "he brought up the fact that she was tied to a chair, and it was really brutal," and he seemed "excited and happy" to talk about it.

Two bartenders from another strip club also testified about conversations with Hachmeister. One bartender testified that Hachmeister told her about the memorial tattoo for his mother who had passed. He also mentioned that there was a life insurance policy that he would have to share with his brother.

The other bartender testified that, in October or November 2011, Hachmeister told her that he killed his mother. Hachmeister also showed this bartender his tattoo which prompted the bartender to ask: "Well, why would you do that if you killed her?" Hachmeister replied, "To give the jury sympathy." Hachmeister told the bartender, "I really did kill my mom." She responded sarcastically, "Really? Well, good for you." Then Hachmeister reached out, grabbed her arm, and said, "No, I really did. I hacked that fucking bitch up." Hachmeister seemed angry, and the bartender did not think he was joking around. Later that night, Hachmeister came back to the bar asking to talk to the bartender again. She testified:

7

"He was telling me about his carpeting. That he still wanted to live in the home, but that fucking bitch bled so much all over the carpets, he had to rip the carpeting out and replace the carpeting. He had to paint the walls. He had to—something about the drapes or blinds. I can't remember, it was drapes or blinds he had to replace because there was blood, so much blood all over them."

She also recalled that several times Hachmeister said he "hacked that fucking bitch up."

Upon all the evidence above being admitted at trial, the jury convicted Hachmeister of premeditated murder. Hachmeister waived his right to a jury trial on the aggravated sentencing factors, and the district court imposed a hard 50 sentence. On direct appeal to this court, Hachmeister argues the district court erred in admitting the evidence about Sheila's missing wedding ring and the child pornography found on his computer under K.S.A. 2019 Supp. 60-455(b). He also alleges eight instances of prosecutorial error. Because we find that the single error that occurred was harmless, we affirm Hachmeister's conviction.

ANALYSIS

*The district court did not err when it admitted evidence of Hachmeister's child pornography and Sheila's missing wedding ring under K.S.A. 2019 Supp. 60-455(b).*

Hachmeister claims the district court erroneously admitted evidence of other crimes or civil wrongs under K.S.A. 60-455. First, Hachmeister argues the district court erroneously admitted evidence of Sheila's missing wedding ring. Second, Hachmeister challenges the court's decision to allow evidence of Hachmeister's possession of child pornography and charges associated with this possession.

8

Under K.S.A. 60-455, evidence of other crimes or civil wrongs is admissible "when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2019 Supp. 60-455(b). We review a district court's decision to admit evidence under K.S.A. 2019 Supp. 60-455(b) using a three-step test:

> ""'First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.
>
> "'Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.
>
> "'Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant. The appellate court also reviews this determination only for abuse of discretion.'" *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018).

Hachmeister does not argue against the materiality or relevancy of the child porn or wedding ring evidence. Thus, our analysis is focused on the third step: determining whether the district court abused its discretion in finding that the probative value of the evidence outweighed the potential for undue prejudice against Hachmeister. In order for us to find error, Hachmeister must show that the district court's ruling

> "'"(1) is arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, i.e., if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact,

9

i.e., if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. [Citation omitted.]"'" *State v. Ross*, 310 Kan. 216, 224-25, 445 P.3d 726 (2019) (noting that the burden of proof is on the party alleging the discretion was abused).

*Wedding Ring Evidence*

Hachmeister first challenges the district court's decision to admit evidence of Sheila's missing wedding ring. During trial, the court admitted testimony from Detective Dickey that referenced Sheila's missing wedding ring. Specifically, Hachmeister challenges Detective Dickey's testimony about an interview conducted with Sheila's friend Raye. Over objection, the district court allowed Detective Dickey to testify that he learned from Raye that "Sheila was going to go home . . . ask Jason or tell Jason to move out. She was concerned about a missing wedding ring, and she wanted to get on with her own life, and it was time for him to move out."

The district court admitted this under K.S.A. 60-455 to show "a point of confrontation" that could be used to establish motive. Hachmeister, however, claims the district court abused its discretion in admitting this evidence because its prejudicial value substantially outweighed its probative value. Hachmeister argues the evidence merely went to the character of the accused rather than a lawful purpose listed under K.S.A. 2019 Supp. 60-455(b).

We find Hachmeister's argument unpersuasive. Other than Hachmeister's own mentioning of the confrontation about the wedding ring in his videotaped interview with Detective Dickey, the trial references to the missing wedding ring involved Sheila *confronting* Hachmeister about the missing ring, not accusing him of taking it. Even Hachmeister noted in his briefings to this court that "[n]o evidence was admitted to support Mr. Hachmeister actually taking, or having taken, the wedding ring, but there

10

was evidence merely that it was not found by family members after her death, and of course that Sheila suspected he had taken it."

We understand that this evidence may have shed an unfavorable light on Hachmeister—but most prior crimes or civil wrongs evidence does. See *Haygood*, 308 Kan. at 1396 (recognizing that most evidence admitted under K.S.A. 60-455 is prejudicial in that it "shines an unfavorable light on a defendant"). But the probative value of this evidence substantially outweighed any prejudice. The confrontation surrounding the missing wedding ring was the key evidence of motive. We find no error in the district court's admission of this evidence.

*Child Pornography Evidence*

Hachmeister next challenges the district court's admission of child pornography found on Hachmeister's computer and charges stemming from this possession. Again, Hachmeister claims the district court abused its discretion in admitting this evidence because its prejudicial effect outweighed its probative value.

At trial, the court allowed evidence that child pornography was found on Hachmeister's computer and of charges for this possession under K.S.A. 2019 Supp. 60-455(b) to identify Hachmeister as the "real killer" writing the anonymous letters. Detective Dickey testified that the letters only started to reference child pornography after Hachmeister became aware of the possession of child pornography charges against him but before these charges were made public. The court then admitted the letter written to Wallace explaining that the "real killer" planted child pornography on Hachmeister's computer.

Again, we recognize that this evidence casts an unfavorable shadow on Hachmeister. But identifying the author of these letters was extremely probative in

11

ultimately identifying the killer. These letters demonstrate intimate knowledge of Sheila's murder not known to the public and other confessional statements by the murderer. Clearly establishing Hachmeister as the author of these letters connects him to Sheila's murder and speaks to the ultimate question of whether Hachmeister killed his mother.

Moreover, the court's limiting instruction to consider the child pornography evidence for the purpose of proving the identity of Sheila's killer diluted any prejudice. Hachmeister fails to offer any supporting authority or explanation as to why the jury was incapable of following the court's limiting instruction. "To the contrary, . . . we presume jury members follow instructions." *State v. Gray*, 311 Kan. 164, 172, 459 P.3d 165 (2020). Given the evidence's probative value in identifying Sheila's killer and the court's limiting instruction reducing any prejudice, we find no error.

*Prosecutorial Error*

Hachmeister also claims that eight instances of prosecutorial error denied him a fair trial. All of Hachmeister's claims of prosecutorial error occurred during the prosecutor's closing argument. Even though Hachmeister failed to make a contemporaneous objection to these comments, we review these alleged errors because this court reviews comments made during closing argument for prosecutorial error even without a timely objection. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017).

When analyzing claims of prosecutorial error, we use a two-step process. First, in order to determine error has occurred, we must decide "whether the act complained of falls outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial." *State v. Chandler*, 307 Kan. 657, Syl. ¶ 6, 414 P.3d 713 (2018). If error is found, we must then determine whether the error prejudiced the defendant's due process rights to a fair trial. 307 Kan. 657, Syl. ¶ 6. In evaluating prejudice, we adopt the traditional harmlessness inquiry set

12

forth in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Under this inquiry, prosecutorial error is harmless "if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

Generally speaking,

"A prosecutor has wide latitude in crafting arguments and drawing 'reasonable inferences from the evidence but may not comment on facts outside the evidence.' Any argument 'must accurately reflect the evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law."' [Citations omitted.]" *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015).

*References to the Missing Wedding Ring*

Hachmeister argues the State committed prosecutorial error by violating the court's evidentiary order to limit testimony about Sheila's missing wedding ring for the purpose of showing motive. He claims the State impermissibly referred to the wedding ring during closing argument to "discredit the defense's case." These references included the State's comment on the lack of a robbery or burglary "except for the missing wedding ring that was never recovered" and Hachmeister's knowledge of the ring being missing.

Recall that the district court limited testimony about the missing ring to prove a confrontation between Hachmeister and his mother. Then evidence about the missing ring came in through Detective Dickey's testimony in two ways: (1) he testified Raye said that "Sheila was going to go home . . . ask Jason or tell Jason to move out. She was

13

concerned about a missing wedding ring, and she wanted to get on with her own life, and it was time for him to move out," and (2) the court admitted the video of Dickey's interview with Hachmeister, where Hachmeister claimed he did not steal his mother's wedding ring and suggested that she might have misplaced it. Hachmeister also told law enforcement that his mother's jewelry was missing after her death, and the "real killer" letters talked about taking jewelry.

Put simply, the State's closing references to the wedding ring did not stray outside the lines permitted at trial. The State either summarized how the wedding ring evidence came in at trial or used it to show confrontation:

> "Man just killed Sheila Hachmeister. . . . Didn't take the TVs upstairs. Didn't take the stereos upstairs. Didn't take the computers upstairs. Right? Didn't even really take any jewelry that we could find, necessarily, *except for the missing wedding ring that was never recovered.*
>
> . . . .
>
> "Remember that conversation that Sheila had with Amy Raye, right? . . . She talked about having problems with Jason. Problems with him just living there, that maybe it was time for him to move out. But *she also mentioned a missing wedding ring that she was concerned about, that she was going to talk to Jason about*. And Jason is the one who confirms that that conversation took place, because when he went in to talk to Detective[s] Dickey and Arensdorf, he talked about that. *Yes, my mom did have concerns with me taking a wedding ring*. She misplaces things all the time. But she did talk to me about that. She talked to me about moving out.
>
> . . . .
>
> "I told you at the beginning motivation was going to be hard to figure out, because there's so many. . . . *She confronted him about a missing wedding ring*. I can imagine it was awkward after that.

14

. . . .

> "That that William Johnstrom, going through the whole house, seeing cash on the table, seeing computers upstairs . . . decides the only thing that he thinks he's gonna take out of that house also happens to be in Jason's room, and it's a Buddha. A cheap $20 Buddha. . . . It's just ridiculous. And he says his mother's jewelry are stolen. . . . And you know what the only jewelry anybody can ever say was missing, *the wedding ring that Sheila Hachmeister talked to Jason about on September 9th or the morning of the 10th*." (Emphases added.)

We are persuaded that the State's use of the wedding ring evidence was limited to showing a confrontation between Sheila and Hachmeister. The prosecutor's comments were not accusatory but rather showed the subject of the confrontation between Hachmeister and Sheila. Thus, we find no error.

> *"They got the same subpoena power . . . . And if they thought that William Johnstrom had something to add in, they could have put him up there[.]"*

During closing argument, defense counsel argued the State had "tunnel vision" and zeroed in on Hachmeister without investigating Sheila's other lovers that she met online. Hachmeister's defense was that one of Sheila's lovers—strangers she met on dating websites—killed her. Sheila was divorced and active on dating websites. Sheila's conversations on these sites were sexually explicit; often involved master-servant relationships; and one thread even talked about strangulation. The month before Sheila's death, she was actively communicating with Johnstrom from Florida, and the two engaged in master-servant sexual dialogue. Hachmeister's defense counsel focused on Johnstrom and the lack of investigation into him.

15

In the State's rebuttal argument, the prosecutor said:

"I've got the burden, absolutely. And I brought in witness after witness after witness to show you how the evidence adds up in its totality. Even if you just take the crime scene evidence by itself and the nature of the crime, it points to Jason Hachmeister beyond a reasonable doubt. . . . But you know what, they don't have a burden, absolutely true. *But if they want to bring forth assertions that poke holes in reasonable doubts or poke holes in my case, they got the same subpoena power, they got the same process of authorizing tests that I do. And if they thought that William Johnstrom had something to add in, they could have put him up there, just like we could have.* Right? If he's so easy to track down, he didn't use fake names or emails on his PlentyofFish.com cite, well, we didn't figure that out. We didn't find it." (Emphasis added.)

Hachmeister equates this comment to burden shifting. Generally, "a prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case." *State v. Williams*, 299 Kan. 911, 940, 329 P.3d 400 (2014). And "[w]hen the defense creates an inference that the State's evidence is not credible because the State failed to admit a certain piece of evidence, the State may rebut the inference by informing the jury that the defense has the power to introduce evidence." *State v. Blansett*, 309 Kan. 401, 415, 435 P.3d 1136 (2019). This even goes so far as to permit the State to comment on the defense's subpoena power to rebut the same evidence. See 309 Kan. at 414; *Williams*, 299 Kan. at 939 (holding that "if a defendant asks the jury to draw an inference that the State's evidence is not credible because the State did not call a witness to corroborate other evidence, we have held that the State can refute the inference by informing the jury that the defense has the power to subpoena witnesses, including those who would be favorable to the defense"); *State v. Naputi*, 293 Kan. 55, 64, 260 P.3d 86 (2011) (holding that it was not improper for the State to respond to defense counsel's "purported inference" that the State refused to call a witness beneficial to the defense "by pointing

16

out that if the [witness] would have been helpful to the defense, the defense could have subpoenaed him"). Accordingly, we find the prosecutor appropriately rebutted the defense's argument by pointing out the defense's own lack of investigating Sheila's online acquaintances.

*"Rabbit trail" and "Ridiculous"*

The prosecutor also rebutted the defense's criticism of failing to investigate Johnstrom by explaining the State decided not to pursue him as a suspect because law enforcement realized it was just a "rabbit trail." The prosecutor tried to debunk the Johnstrom-did-it theory by claiming it didn't add up:

> "To suggest that somebody like William Johnstrom drove from Florida, happened to find that sweet spot between 11:30 and 1:30, whenever her optometrist appointment was, and kill her like that and then targeted every single piece of evidence that points to him as the true killer in this case . . . then takes the time to write coded letter after coded letter after coded letter trying to get our attention away from Jason, because he's got an ego too big, because he wants credit? It's not evidence. *It's not based on evidence. Those conclusions are wishful thinking, hoping that you get off [sic] a rabbit trail.* That you get tunnel vision. That you start picking apart every little thing to see if it all adds up. Well, I welcome that. I hope you do that. I hope you unroll the carpet. Walk through it." (Emphasis added.)

We find that the rabbit trail comments, when viewed in context, are fair rebuttal explaining why law enforcement did not pursue Johnstrom as a lead (rebutting the "tunnel vision" accusation in particular) and a fair argument about why the Johnstrom theory did not add up based on the evidence. This is an example of a "'[f]air comment on trial tactics and the interpretation of evidence'" that does not "'"inappropriately denigrate opposing counsel or inject personal evaluations of the honesty of witnesses."'" *State v. Butler*, 307 Kan. 831, 865, 416 P.3d 116 (2018) (quoting *State v. Crum*, 286 Kan. 145,

17

150, 184 P.3d 222 [2008]); see also *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018) ("Appellate courts consider the prosecutor's comments in the context in which they were made rather than in isolation.").

Hachmeister also challenges the prosecutor's use of the word "ridiculous" in its argument. The prosecutor used this word to, again, rebut the Johnstrom-did-it theory. The prosecutor said:

"How do we know it's not William Johnstrom, when the computer, the only computer taken out of the whole house, happens to be the one owned by Jason Hachmeister? And then it's removed so carefully that . . . the cables are placed back under the desk. That that William Johnstrom, going through the whole house, seeing cash on the table, seeing computers upstairs, multiple computers upstairs, three TV's, decides the only thing that he thinks he's going to take out of that house also happens to be in Jason's room, and it's a Buddha. A cheap $20 Buddha. And you can say it's got gold paint on there, but ain't nobody going to steal a Buddha to go take that somewhere to pawn. Where are you going to pawn a solid gold Buddha? *It's just ridiculous. It's just ridiculous.* And he says his mother's jewelry are stolen. . . . And you know what the only jewelry anybody can ever say was missing, the wedding ring that Sheila Hachmeister talked to Jason about on September 9th or the morning of the 10th." (Emphasis added.)

Recently in *Butler* this court considered whether the State's repeated use of the word "ridiculous" was fair comment on the evidence. There, the defense attorney first called the State's theory "ridiculous." 307 Kan. at 863. Then in rebuttal, the State repeatedly used the same term to describe the defense theory claiming the facts didn't add up. 307 Kan. at 863. The defendant argued that "the prosecutor's comments improperly disparaged his theory of the case as well as imparted the prosecutor's personal opinion to the jury." 307 Kan. at 865.

18

The *Butler* court held the use of the word "ridiculous" was fair comment in context. Citing the dictionary definition of "ridiculous," the court reasoned that "[t]he most reasonable assumption is the prosecutor was simply arguing Butler's version of the events was unworthy of serious consideration, i.e., it was not believable." 307 Kan. at 867. The court explained:

> "The manner in which Butler's trial counsel used the same word in closing arguments bolsters our interpretation. Defense counsel posited the State's theory of the case was 'simply ridiculous' because '[i]t makes no sense. It makes no sense because it didn't happen.' In other words, defense counsel was imploring the jury to consider the testimony given at trial and find it not believable." 307 Kan. at 867.

The State's use of the word "ridiculous" here was used for the same purpose as in *Butler*—to comment on the believability of the Johnstrom-did-it theory. It did not disparage the defense or comment on Hachmeister's allegation of innocence. The "ridiculous" comments were few—just twice—and were made to rebut the Johnstrom theory. Thus, we find no error.

*"These people have no skin in the game."*

Hachmeister also argues the prosecutor's closing argument contained improper comments on witness credibility or vouching. The prosecutor commented on the credibility of several of the witnesses, saying:

> "When you ask what the credibility of these witnesses, right, to weigh what they have to say, every piece of evidence that you hear that you will deliberate on must come from this chair. Somebody tells you that something happened. Somebody tells you they heard something. . . . That's the evidence you consider. You consider Joe Patton's credibility [Starbucks barista]. He didn't know any of these people. All he knows is Jason

19

Hachmeister is a customer. He doesn't know why Detective Arensdorf called him up, but he gives good information. Can we corroborate that information? Yes we can. You go to the nursing home lady, who does the exact same thing. *These people have no skin in the game. They've got no agenda.* They're just here telling you what they saw and what they heard. And all that points back to Jason Hachmeister." (Emphasis added.)

Indeed, "[a] prosecutor who speculates about witness motives walks a fine line between 'explaining to juries what they should look for in assessing witness credibility,' *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 (2009), and 'improperly bolstering the credibility of its witnesses' by 'injecting [his or] her personal opinion regarding witnesses' motives,' *State v. Sprague*, 303 Kan. 418, 429, 362 P.3d 828 (2015)." *State v. Anderson*, 308 Kan. 1251, 1261, 427 P.3d 847 (2018). But we consistently draw a distinction between the two finding the former acceptable. Prosecutors may comment on a witness' lack of motivation to be untruthful but must base these comments on the evidence and reasonable inferences from the evidence without stating their own personal opinion concerning the witness' credibility. See *State v. Armstrong*, 299 Kan. 405, 427, 324 P.3d 1052 (2014) ("[I]t is not improper for a prosecutor to offer 'comments during closing arguments regarding the witness' motivations to be untruthful.'"); *State v. Ortega*, 300 Kan. 761, 777, 335 P.3d 93 (2014) (approving of the prosecutor's rhetorical question probing whether there was any motivation for the witness to lie because "[e]xamining whether a witness has a motive to lie is a valid consideration in weighing credibility"); *State v. King*, 288 Kan. 333, 353, 204 P.3d 585 (2009) (holding that it is not improper for a prosecutor to offer "comments during closing argument regarding the witness' motivations [or lack thereof] to be untruthful"); *McReynolds*, 288 Kan. at 326 (prosecutor may offer the jury an explanation of "'what it should look for in assessing witness credibility'"); *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008) (same).

In *Ortega*, for example, this court held that a prosecutor's comments about the witnesses' lack of incentives to lie were proper. There, the prosecutor asked rhetorical questions that probed whether there was any motivation for the witness to lie:

"While discussing the elements of disorderly conduct, the prosecutor pointed to the discrepancy in witnesses' testimony and reminded the jury that they are 'going to have to judge the credibility of witnesses.' The prosecutor continued stating:

> "'*What reason do they have to lie to you?* Perhaps somebody who might think, well, police officers do this all the time. I don't necessarily know why you would think that, but that's the most cynical possible thing I can think of. Well, set that aside. *Do middle school secretaries come into court and lie all the time? Did Ms. Perez or Ms. Delarosa, the principal, have a reason to come in here and tell you that the defendant did something or said something that she didn't really do?'"* (Emphases added.) *Ortega*, 300 Kan. at 775.

The *Ortega* court ultimately decided "the prosecutor's statements were based on reasonable inferences drawn from the evidence, and the prosecutor was merely explaining what the jury should look for in assessing the credibility of the school officials." 300 Kan. at 775. Here, the prosecutor's comment that the barista and the nursing home employee had "no skin in the game" or "agenda" are similar. The prosecutor made these comments so the jury could examine whether the witnesses here had a motive to lie—a valid consideration in weighing credibility. Further, the prosecutor did not inject any personal opinion into these statements. Rather, the prosecutor made a reasonable inference that these witnesses lacked a motive to lie given their peripheral connection to Hachmeister. Accordingly, the prosecutor's statements were within the wide latitude allowed the State when discussing evidence.

> *"We know that full rigor mortis was set in by the time that Sheila Hachmeister was found dead at 4:00."*

Next, Hachmeister challenges the State's comments on Sheila's time of death. During closing, the State said:

21

"Let's talk about the time line for a minute. . . . *We know that full rigor mortis was set in by the time that Sheila Hachmeister was found dead at 4:00*. Not a little bit. Not just in her jaw, and not just in her extremities, but full rigor mortis. Her belly, her back, her breasts, her shoulders, everything was straight-up rigid. Every muscle's contracted due to that lactic acid buildup, as Dr. Mitchell explained to us last week." (Emphasis added.)

Hachmeister claims this misstated evidence because the coroner Dr. Erik Mitchell did not provide a definitive time of death and there was no authoritative diagnosis of rigor mortis at 4:00 p.m. The State, however, claims this was a reasonable inference based on the evidence.

We agree with the State. While Dr. Mitchell testified that he could not give a "definitive opinion" about Sheila's time of death, the State was not limited to Dr. Mitchell's testimony when drawing reasonable inferences. *State v. Pribble*, 304 Kan. 824, 832, 375 P.3d 966 (2016) (explaining that prosecutors' wide latitude in crafting closing arguments "allows a prosecutor to argue reasonable inferences that may be drawn from the admitted evidence"). For example, first responder Corporal Green testified that he touched Sheila's dead body to check her vitals at the scene and described her as "stiff and cold." Green continued to state that Sheila's body was "very rigid"; her skin had "no flexibility" and felt like "rocks."

Later, Dr. Mitchell defined rigor mortis as "stiffening of the muscles" postmortem. Dr. Mitchell testified that Sheila was in rigor mortis "probably at least hours before she's found." While Dr. Mitchell did not directly state Sheila was in full rigor mortis at 4:00 p.m., it was a reasonable inference for the prosecutor to make. First responders, such as Green, arrived at Sheila's house shortly after 4:00 p.m. and found her dead body cold and stiff. And according to Dr. Mitchell, rigor mortis is the stiffening of the body's muscles postmortem and this would have occurred hours before Sheila was found. We find no error in the prosecutor's comment. Rather, the prosecutor's comment was a reasonable inference based on the evidence presented.

22

> *"[B]etween the time Sheila Hachmeister was killed, or about the time Sheila Hachmeister was killed, her dog was placed outside in the backyard for three hours."*

Hachmeister also challenges the prosecutor's statements about Sheila's dog when establishing a timeline for Sheila's death. When the prosecutor proposed its timeline, he used evidence of Sheila's dog being placed outside to establish Sheila was killed in the morning:

> "Coincidentally, *between the time Sheila Hachmeister was killed, or about the time Sheila Hachmeister was killed, her dog was placed outside in the backyard for three hours*. The dog had no blood on it. You can imagine, again, based on common knowledge and experience, that had Sheila Hachmeister been attacked, moved around her house, strangled and left for dead, that her dog would be all over her. . . . There's no blood on the dog whatsoever. The dog was outside for the entire time until the scene was cleaned up. Somebody went back to that sliding glass door, left her blood on it as they opened the door, but took the dog, not through all the blood in the living room, but straight through to the kennel where the dog was found at 4:00 o'clock in the afternoon. Sheila Hachmeister was most likely killed the morning of September 10th, 2011." (Emphasis added.)

Hachmeister argues the italicized portion is misstated evidence because the State's theory that Sheila was killed while her dog was outside between 9:00/9:30 a.m. and 12:00/12:30 p.m. was not reasonable based on the evidence. But while there is no direct evidence of Sheila's time of death, circumstantial evidence reasonably supports the State's theory that Sheila was killed in the morning while her dog was outside. Sheila's neighbor testified that Sheila's dog—which was an inside dog that did not usually stay outside more than 10 minutes—was outside that morning barking nonstop from about 9 or 9:30 a.m. until about 12 or 12:30 p.m. Again, Dr. Mitchell estimated that she had been in rigor mortis for

"probably hours" before she was found. Finally, Sheila's dog was in a kennel when law enforcement arrived shortly after 4:00 p.m. And despite the bloody crime scene, the dog had no blood stains on it. We find no error because, taken together, a reasonable inference is that Sheila was murdered while her dog was outside that morning. *State v. Banks*, 306 Kan. 854, Syl. ¶ 4, 397 P.3d 1195 (2017) ("[P]rosecutors are allowed to craft arguments that include reasonable inferences to be drawn from circumstantial evidence, so long as the circumstances have themselves been proved, rather than having been presumed from other circumstances.").

*Description of the dissection of Sheila's sex organs.*

Next, Hachmeister challenges the prosecutor's reference to Sheila's sex organs during its rebuttal. During trial and closing argument, the defense focused on certain evidence that was never tested. For example, in closing argument defense counsel talked about how evidence from the coroner's rape kit such as hair found on the body, vaginal swabs, and underwear were never tested to determine whether Sheila had any recent sexual activity.

In response, the State said:

"You know why we didn't test her for rape or sexual assault? She wasn't raped or sexually assaulted. That's the way she arrived at the coroner's office. Her panties are in place. There's not a stitch out of line. They are as smooth and as straight as when she put them on. *I didn't show you these pictures, but they not only looked at her external genitalia and didn't see any signs of injury or any signs of sexual activity at all, they cut it open. They pulled her pelvic bones apart and they looked at the inside of her vaginal vault. They looked at everything leading up to her cervix.* This was an autopsy, for God's sakes. They looked at everything. Dr. Mitchell went through her. He would not believe that she was not sexually assaulted." (Emphasis added.)

24

Hachmeister argues the italicized portion was unsupported by the evidence and was inflammatory. But the State's rebuttal comment—though perhaps graphic—appears to be accurate based on Dr. Mitchell's testimony. Dr. Mitchell spoke at length about how he dissected Sheila, looked at her genitalia, and concluded there were no signs of sexual assault. At trial Dr. Mitchell talked about his external examination of Sheila's genitalia and confirmed that he saw no bruising or indication of trauma in those areas. And indeed, during an exchange with the State, Dr. Mitchell testified to the information contained in the State's rendition. In short, Dr. Mitchell testified he examined Sheila's genitalia "from the inside out" and confirmed that he saw no bruising or indication of trauma in those areas. Given that the prosecutor's comment was supported and no more graphic than the testimony by Dr. Mitchell itself, we find no error.

*The State's description of Sheila's strangulation death.*

Lastly, Hachmeister claims the State misstated evidence during its closing argument while discussing premeditation. The prosecutor argued:

"Now, again, remember how she died, because that becomes important for premeditation. She didn't die because her larynx was crushed and she just couldn't breathe in. Right? *She could breathe just fine.* The supporting bones on her larynx were fractured, which is some indication of the force that was used to hold her down. But her trachea wasn't smashed, *she could breathe fine.* What did the coroner tell you about the carotid arteries? They were open. There wasn't enough pressure there to close off the carotid arteries in the side of her neck, so she was still getting blood into her brain. What she doesn't do is get the blood out of her brain. The veins in her neck were collapsed. The low pressure veins in her neck were collapsed, and so, as the blood builds up in her brain, eventually she's deprived of oxygen and that's what kills her." (Emphases added.)

Hachmeister claims this misstates the evidence presented about the mechanism of Sheila's death and that the statements about her ability to breathe were especially inflammatory. Hachmeister points out that Dr. Mitchell did not conclude exactly how

Sheila died by strangulation—whether it was by blocking the airways or restricting blood flow. Dr. Mitchell said there was "at least a period of time" where she was strangled in such a way that the blood flow could not leave her head. But, he added, "Whether somebody then went on to completely occlude the blood flow and the airway, you don't know." Thus, Hachmeister again points to Dr. Mitchell's inconclusive testimony—which does not definitively state the type of strangulation that caused Sheila's death—to say the State misstated the evidence.

But there was evidence to support the prosecutor's reasonable conclusion that Sheila died by strangulation that restricted the blood flow from her head. Dr. Mitchell first testified about the types of strangulation:

> "You can cut off the blood vessel supply, that would be cutting off the carotid arteries, so you're not bringing blood up to the brain through the carotid arteries. You can block the blood coming out of the head by blocking the veins. Or, you can block the airway or a combination—variable combinations of these."

Then Dr. Mitchell described how strangulation by restricted blood flow to the brain occurs:

> "The simplest thing, with the least amount of force, is blocking the blood flow out, because veins are low pressure whereas arteries are high pressure. They're the high pressure blood coming out of the heart supplying the tissues and then it passively drains back. So stopping the drainage is the simplest. . . . [I]f you just block the outflow, you've still got blood being pumped, in, so the vessels all dilate. And this causes us to get what we call petechial hemorrhages from rupture of the smallest blood vessels, which are the capillaries. . . . [S]he has petechial hemorrhages prominently within the eyes."

26

Finally, Dr. Mitchell testified that Sheila was strangled by cutting off the blood from her head for "at least a period of time." Dr. Mitchell knew this based on the petechial hemorrhages he found in Sheila's eyes, which is a sign that the blood flow out of the brain was blocked.

Hachmeister is right that the type of strangulation Sheila died by is not conclusive, and her larynx, or voice box, was broken, suggesting she had substantial pressure on her neck. But even so, the State's theory that Sheila died by restricting blood flow from the brain, which caused petechial hemorrhages, is reasonably based on Dr. Mitchell's testimony. It is not inflammatory, and it supports the State's premeditation theory. See *State v. Walker*, 304 Kan. 441, 446, 372 P.3d 1147 (2016) ("We have noted many times that death by strangulation presents strong evidence of premeditation.").

But the State's claim that Sheila "could breathe just fine" crossed the line into speculation and was inflammatory. Under the State's theory, Sheila did not die by a restricted airway; she died by restricted blood flow. That said, there was still evidence that Sheila's neck was bruised and her larynx was broken. Suggesting Sheila could breathe "just fine" exceeds the prosecutor's ability to draw inferences from the evidence. *Chandler*, 307 Kan. at 670 ("Presumptions and inferences may be drawn from established facts, but a presumption may not rest on presumption or inference on inference. In other words, an inference cannot be based on evidence that is too uncertain or speculative or that raises merely a conjecture or possibility.").

This error, however, is harmless in light of the trial as a whole. Based on the overwhelming evidence presented against Hachmeister, we are persuaded beyond a reasonable doubt that the State's claim that Sheila could "breathe just fine" during the strangulation did not affect the outcome of trial. See *Sherman*, 305 Kan. at 109 (holding that prosecutorial error is harmless "if the State can demonstrate 'beyond a reasonable

27

doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict'"). Further, this single error ""'is insufficient to support reversal under the cumulative effect rule."'" *Blansett*, 309 Kan. at 417.

Affirmed.

NUSS, C.J., not participating.[1]
PATRICK D. MCANANY, Senior Judge, assigned.[2]

---

[1]**REPORTER'S NOTE:**  Chief Justice Nuss heard oral arguments but did not participate in the final decision in case No. 114,796. Justice Nuss retired effective December 13, 2019.

[2]**REPORTER'S NOTE:**  Senior Judge McAnany was appointed to hear case No. 114,796 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.