IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,837

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY ROBERTS JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

An appellate court reviews an instructional error claim in multiple steps. First, the court decides whether the issue was properly preserved. Second, it considers whether the instruction was legally and factually appropriate. In doing so, the court exercises unlimited review of the entire record and views the evidence in the light most favorable to the requesting party. And, finally, when the reviewing court finds error, it determines whether that error is reversible.

2.

The doctrine of invited error precludes a party from asking a district court to rule in a given way and then challenging that ruling on appeal. The doctrine's application turns on whether the record reflects the party's action in fact induced the court to make the claimed error.

3.

There is no error in failing to give a jury instruction that is not legally appropriate.

1

4.

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed February 4, 2022. Affirmed.

*Danielle N. Davey*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Topeka, argued the cause, and *Shaye L. Downing*, of the same firm, of Lawrence, was on the briefs for appellant.

*Steven J. Obermeier*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: Following a fatal shooting in downtown Lawrence, a jury convicted Anthony Roberts Jr. of two counts of first-degree felony murder and one count each of intentional second-degree murder and attempted intentional second-degree murder. Roberts appeals his convictions, alleging jury instruction error and challenging the sufficiency of the State's evidence. For the reasons stated below, we affirm Roberts' convictions.

FACTS

In the early morning hours of October 1, 2017, Lawrence Police Sergeant Michael McLaren and Officer Tyler Haney were patrolling downtown Lawrence to monitor the growing crowds as bars were closing and a concert at the Granada Theater was ending. Around 1:30 a.m., McLaren and Haney were in a parking lot at the intersection of 11th and Massachusetts Streets when they heard 12 to 15 rounds of gunfire coming from the northwest corner of the intersection in front of the Watkins Museum of History. After a pause in the gunfire, they saw a Black male wearing a green shirt get up off the ground, shoot a black semiautomatic handgun four or five times to the north, and then run west on 11th Street.

The incident left three people dead from gunshot wounds. Leah Brown died at the scene; Colwin Henderson III and Tre'Mel Dean later died at the hospital. Two other shooting victims survived. Tahzay Rayton had gunshot wounds in his left hip and pelvic area. Royelle Hunt was shot in his right leg.

Law enforcement was unable to locate any suspects leaving the scene in the crowded and chaotic aftermath of the shooting. Lawrence Police Officer Ian McCann was on patrol on the west side of town when he heard about the shooting and the suspect description of a Black male wearing a green shirt. McCann parked on west 6th Street, a location which provided access to Topeka by multiple routes to the west. McCann observed a black Kia Sportage and a dark black Pontiac driving west. The Pontiac was following closely behind the Kia. Based on his training, this led McCann to believe that the Pontiac was attempting to keep the Kia from being detected. The Kia had a license plate that was hanging by one screw. After McCann ran a records check and learned that the Kia's license plate was invalid, he initiated a traffic stop. Four Black males were inside: Roberts was driving and Marvel Miller, Dominique McMillon, and Ahmad

3

Rayton were passengers. None of the men were wearing a green shirt, but Ahmad Rayton was not wearing a shirt at all. The rear passenger window next to Rayton was down, and he was sweating profusely. Roberts was breathing heavily and had a gun on his right hip. Roberts said that he was the lawful owner of the gun and that he was carrying it for protection. McCann removed Roberts' gun from his person and verified that the gun—a fully loaded Glock 26 9-millimeter handgun—had not been stolen. McCann informed Roberts that law enforcement was looking for suspects from a downtown shooting. Roberts and Miller both advised McCann that they had come from Topeka to see Roberts' aunt and Miller's mother, Felicia Brooks, and denied that they had been downtown. Lacking any information that would allow him to search the vehicle or otherwise continue the detention, McCann allowed the men to leave.

During the investigation into the shooting, law enforcement observed video evidence that pointed to the presence of two shooters. And the physical evidence collected from the scene established that two guns were fired. Investigators recovered six .40 caliber shell casings in front of the Watkins Museum on the west side of Massachusetts Street, fifteen 9-millimeter shell casings on the south side of the museum on 11th Street, and several bullet fragments in the area. Law enforcement identified Roberts and Ahmad Rayton as potential suspects. The .40 caliber shell casings were all fired from the same gun, and DNA recovered from them matched Ahmad Rayton's DNA profile. The 9-millimeter shell casings were all fired from another gun, which investigators determined belonged to Roberts. Although law enforcement linked the 9-millimeter shell casings to Roberts' gun, Roberts' DNA was not found on any of the shell casings. And law enforcement could not confirm or rule out Roberts' gun as the weapon used to fire the bullet fragments found at the scene or retrieved from the victims. But based on its analysis of video collected from various downtown locations, law enforcement believed Roberts fired the first round of gunshots that hit Dean, Brown,

4

Henderson, and Tahzay Rayton, while Ahmad Rayton fired the second round of gunshots to the north that hit Hunt.

The State filed four charges against Roberts: two counts of first-degree felony murder of Brown and Dean, intentional second-degree murder of Henderson, and attempted intentional second-degree murder of Tahzay Rayton.

At Roberts' jury trial, the State introduced evidence to show that the shooting stemmed from a feud between two groups of people from Topeka. Roberts belonged to one of the groups, and Henderson belonged to the other. The State theorized that earlier in the evening, a fight occurred outside the Granada between Dacorey Brown, who was part of Roberts' group, and Jalan Richardson, who was friends with Henderson. The State claimed Brown went back to Topeka and then later returned to downtown Lawrence with Roberts, Miller, McMillon, and Ahmad Rayton. The State alleged Roberts intentionally shot Henderson, and while doing so, shot the other three victims, killing Brown and Dean and injuring Tahzay Rayton.

Robert Wheeler, Henderson's cousin, testified that he and Henderson went to the concert at the Granada with friends. After the concert, Wheeler, Henderson, and another friend left the Granada around 1:30 a.m. and went across the street toward Brothers Bar & Grill. They saw Roberts, who was sitting on the steps of the Watkins Museum. Wheeler knew Roberts and the three men Roberts was with—Miller, McMillon, and Ahmad Rayton—from Topeka. Wheeler testified that there were "hard feelings" between the two groups and they did not get along. Wheeler said that as they walked by, Roberts got up and said, "'What's poppin'?'" while waving a black gun with an extended clip down by his hip. Wheeler said that in response, Henderson turned around and said, "'What's up?'" Seeing Roberts' gun and wanting to avoid any trouble, Wheeler urged Henderson to keep walking across the street, where they talked to some friends.

5

After seeing another friend nearby, Wheeler testified that he approached Roberts and said, "'I don't know why you're trying to call my cousin out. We already got into a fight years ago and this is dumb.'" Then, according to Wheeler, McMillon hit him in the head and they began fighting. Wheeler saw that McMillon had a gun in his waistband under his shirt but had dropped it during the fight. Wheeler testified that Roberts then started "recklessly shooting," rapidly firing about 20 shots. Wheeler saw Dean fall to the ground. At the same time, Wheeler said that he and Ahmad Rayton started throwing punches at each other and that Ahmad pulled a gun from his waistband during the fight. Wheeler claimed that he pushed Ahmad to the ground and ran away as bullets flew past his head. Wheeler was at his car when someone called to tell him that Henderson was shot. Wheeler returned to the scene and found Henderson on the ground across the street from the museum. Wheeler at first told law enforcement that Ahmad Rayton must have shot Henderson based on where everyone was standing. But at trial, Wheeler testified that he did not see Henderson get shot and did not know who shot him.

Toiyonte' Hunt was with Wheeler and Henderson at the concert. Hunt testified that he was near the fight between Wheeler and McMillon and saw Ahmad Rayton jump into the fight. Hunt said that when he heard the gunshots, he ran away in the opposite direction and did not see who was shooting. But Hunt said that he did not believe that Ahmad Rayton fired the gunshots.

Marvel Miller testified that he was with Roberts, McMillon, and Ahmad Rayton at an apartment complex in Topeka on September 30, 2017. Miller said Brown arrived sometime late that evening, bleeding and bruised, and then they all went to Lawrence. Miller claimed not to remember telling law enforcement during his interview two years earlier that they went to Lawrence because of what had happened to Brown at the Granada. Instead, Miller testified that they had already decided to go to Lawrence for a concert before Brown arrived. Miller testified that he saw Wheeler and Henderson at the

6

intersection of 11th and Massachusetts Streets. Miller said that he knew that Roberts "wasn't cool" with Wheeler. But Miller denied that Roberts ever threatened or flashed a gun at Wheeler or Henderson. Miller claimed that Wheeler started the fight with McMillon. Miller said that as he moved away from the fight, he heard gunshots behind him but did not see who was firing the gun. Miller admitted, however, that he might have told law enforcement in his interview two years before trial that he saw Roberts shooting to the east. After meeting Roberts, McMillon, and Ahmad Rayton at the car, Miller said that he asked Roberts "why he did that" and Roberts just shook his head. Miller admitted that he lied to law enforcement about going to his mother's house that night.

Kayla Hugghis, Roberts' cousin, testified that Roberts was living with her around the time of the shooting. Hugghis said that sometime shortly after the shooting, Roberts told her that he shot Henderson, he did not mean to shoot Dean or Brown, and that he put his gun away after he saw Henderson fall. Hugghis quoted Roberts as saying, "'I shot Colwin. I didn't shoot the girl and I didn't shoot [Dean]. I shot Colwin and I put my gun away when I was done.'" Hugghis also testified that Roberts had planned to go to Lawrence earlier in the day and denied that going there was a last-minute decision. Hugghis admitted that she knew nothing about the incident with Brown. Hugghis said that Roberts always carried a gun for protection and that she believed Roberts only fired his gun because he was fighting for his life.

Andrew Davis testified that he was incarcerated in the Douglas County Jail with Roberts in 2018. Davis said that Roberts talked about his case and said that the evidence against him was only circumstantial and that the altercation had stemmed from conflict over a past murder. Davis claimed Roberts said that he fired two shots, but one ended up hitting someone he did not intend to kill.

7

After the State rested its case, Roberts testified in his own defense. Roberts said that he and his friends decided early in the day to go to Lawrence to hang out during the concert, and that they made that decision well before hearing about Brown's fight at the Granada. Roberts admitted that he saw Brown at an apartment complex in Topeka that night and that Brown was bleeding but denied that he changed his plans based on what had happened to Brown. Roberts also claimed that he did not know who had hit Brown. Roberts testified that he took his gun with him to Lawrence because he always carried it for protection, not because he was expecting trouble that night. Roberts and his friends drove to Lawrence in two vehicles. Secada Adams drove Roberts' Kia with Roberts and Miller as passengers, while Brown drove a white SUV with McMillon and Ahmad Rayton as passengers. Roberts said that the Kia had a broken tail light and there was an issue with the license tag, so the SUV followed behind the Kia to block it from detection. Roberts testified that both vehicles parked at the Vermont Towers apartments, but Adams and Brown left soon after to go to the hospital in Topeka.

Around 1 a.m., Roberts, Miller, McMillon, and Ahmad Rayton walked to Massachusetts Street. They could not get into Brothers Bar & Grill, so they crossed 11th Street and approached the Granada but did not go inside. Roberts said that he saw Wheeler, Henderson, and others in their group but turned around because he did not get along with them; Roberts then crossed the street to the Watkins Museum to talk to Tahzay Rayton and Dean. There, Roberts said that he went to the bathroom in an area north of the museum and afterward saw Wheeler and Henderson again. Roberts denied saying anything to them or touching his gun. Roberts claimed he merely crossed his arms over his chest and looked down at the gun holster on his hip, revealing that he was armed. Roberts said that as Wheeler and Henderson walked by, he followed them at a distance to get back to his friends. Once back at the museum, Roberts sat down on a rock wall on the north side of 11th Street, talking to his friends and other acquaintances about their plans for the rest of the night.

Roberts said that Wheeler's group of friends was standing on the south side of 11th Street and were giving off "bad vibes." Roberts denied making any gestures or flashing his gun at them. According to Roberts, Wheeler's group crossed the street and surrounded Roberts and his friends. Roberts testified that Wheeler exchanged words with McMillon and punched him, and then several other people began kicking McMillon and rushing toward Ahmad Rayton. Roberts said that Henderson and Hunt came toward him. Roberts claimed that Henderson began punching him and that Hunt was holding a gun. Roberts denied provoking Hunt or Henderson in any way. Citing a fear of getting shot, Roberts pulled out his gun from its holster and started firing as he backed away. Roberts testified that he was not thinking when he began shooting; he claimed he was not shooting at anyone in particular and did not know how many shots he was firing. Roberts said that he fell down and, hearing another round of gunshots, assumed that Hunt was shooting at him. Roberts got up, put his gun in its holster, and ran west on 11th Street to his car. There, he met up with Miller, McMillon, and Ahmad Rayton to drive back to Topeka. Roberts said that when law enforcement stopped them on their way out of town, Miller told everyone to say they had been at his mother's house.

Roberts testified that he did not intend to hurt or kill anyone and denied that he went to Lawrence looking for a fight. Roberts said it never occurred to him that he had shot anyone because there were multiple people with weapons that night. Roberts claimed that he did not know anyone was shot or killed and that he first found out through social media. Roberts said it made sense that Henderson had died, however, because Henderson had been right in front of him. Roberts denied telling Hugghis that he did not stop firing until he saw Henderson fall. Despite his claim of self-defense, Roberts admitted that he did not try to find law enforcement after the shooting and instead tried to avoid detection by leaving town and lying about his whereabouts when law enforcement pulled him over. Roberts acknowledged that he did not return home for two nights after the shooting and instead went to Kansas City, Missouri. Roberts also conceded that he

9

was dishonest in later interviews with the police but claimed that he was under the influence of drugs and alcohol then.

During closing arguments, defense counsel alleged that the forensic evidence did not establish that Roberts had shot any of the victims. But even if it did, counsel argued that Roberts did not intend to kill Henderson and urged the jury to consider several lesser included offenses instead of the second-degree murder and attempted second-degree murder charges. Counsel also asked the jury to consider whether Roberts had acted in self-defense.

The jury rejected these arguments and found Roberts guilty as charged. The district court imposed a controlling sentence of 226 months in prison plus two consecutive hard 25 life sentences. Roberts filed this timely appeal.

ANALYSIS

Roberts raises two issues on appeal. First, he argues that the district court erred in failing to instruct the jury on voluntary manslaughter as an additional underlying felony of felony murder. Roberts acknowledges that he did not request the voluntary manslaughter felony-murder instruction. Second, Roberts alleges that the evidence was insufficient to support his convictions, claiming the State failed to prove that he intended to kill Henderson—a required element of each conviction. We address Roberts' issues in turn.

1. *Felony-murder instruction*

In counts 1 and 2, the State charged Roberts with felony murder for the deaths of Brown and Dean. In count 3, the State charged Roberts with the intentional second-degree murder of Henderson.

Felony murder is statutorily defined as the killing of a human being "in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2020 Supp. 21-5402(a)(2). The felony-murder charges depended on the underlying felony of intentional second-degree murder, which is expressly designated in the statute as an inherently dangerous felony. See K.S.A. 2020 Supp. 21-5402(c)(2)(B).

Consistent with the statutory definition, the district court issued instruction No. 16:

"In Count 1, the defendant is charged with murder in the first degree of Leah Brown. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:
1. The defendant killed Leah Brown.
2. The killing was done while defendant was committing the crime of murder in the second degree of Colwin Henderson III.
3. This act occurred on or about the 1st day of October, 2017, in Douglas County, Kansas.
The elements of murder in the second degree are as follows:
1. The defendant intentionally killed Colwin Henderson III.
2. This act occurred on or about the 1st day of October, 2017, in Douglas County, Kansas.
"The State must prove that the defendant committed the crime intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State."

11

Instruction No. 17 contained identical language but listed the felony-murder victim as Dean instead of Brown.

The district court separately instructed the jury on the charge alleged in count 3 of the complaint, the intentional second-degree murder of Henderson. Although the State elected to charge Roberts only with intentional second-degree murder, the court instructed the jury on several lesser included offenses it could consider on this charge if it did not unanimously agree that Roberts was guilty of second-degree murder. Voluntary manslaughter was one of the lesser included offenses the jury could consider.

Roberts argues that because the jury could consider voluntary manslaughter as a lesser included offense to the second-degree murder charge in count 3, the court should have given felony-murder instructions for counts 1 and 2 that allowed the jury to consider voluntary manslaughter as an alternative underlying felony to intentional second-degree murder. Roberts claims that if the court had included a voluntary manslaughter felony-murder instruction, the jury would have been more inclined to convict him of voluntary manslaughter on the underlying offense, rather than second-degree murder. Roberts acknowledges that he did not request the felony-murder voluntary manslaughter instruction.

The State contends that the doctrine of invited error precludes Roberts from raising this argument. In the alternative, the State contends Roberts' argument fails on the merits.

"When analyzing jury instruction issues, we follow a three-step process:

'(1) determining whether the appellate court can or should review the issue, *i.e.,* whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether

12

error occurred below; and (3) assessing whether the error requires reversal, *i.e.,* whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

The first and third step are interrelated: the standard of review for reversibility at the third step depends on whether a party has preserved the jury instruction challenge in the first step. 307 Kan. at 317; see K.S.A. 2020 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). At the second step, we consider whether the instruction was legally and factually appropriate. 307 Kan. at 318. Appellate courts use unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931-32, 376 P.3d 70 (2016). To be factually appropriate, there must be sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

*Step one: preservation and invited error*

The State contends that the doctrine of invited error precludes this court from reviewing Roberts' claim of instructional error. See *State v. Fleming*, 308 Kan. 689, 695, 423 P.3d 506 (2018) (concluding invited error precluded review of asserted jury instruction error on facts presented).

Before trial, Roberts submitted proposed jury instructions, which included the following instruction for both counts of first-degree felony murder:

"The defendant is charged in [Count 1] [Count 2] with murder in the first degree—felony murder—of [Leah Brown] [Tremel Dean]. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved:

1. The defendant killed [Leah Brown] [Tremel Dean].

2. The killing was done while defendant was committing the crime of murder in the second degree.

3. This act occurred on or about the 1st day of October, 2017, in Douglas County, Kansas.

"The elements of murder in the second degree are listed in Instruction No. ___.

"In determining whether a killing occurs in the commission of the underlying felony, factors to be considered are time, distance, and the causal relationship between the underlying felony and the killing. *State v. Kaesontae*, 260 Kan. 386, 920 P.2d 959 (1996)."

During the instructions conference, the parties discussed the felony-murder instructions and the language setting forth the elements of felony murder. Defense counsel stated, "Number two should say, the killing was done while the defendant was committing the crime of murder in the second degree of Colwin Henderson, III." Defense counsel did not request any other language on the elements or otherwise ask the court to instruct on voluntary manslaughter as an alternative underlying felony.

After the district court read the instructions to the jury, it called counsel to the bench to discuss corrections to some of the instructions.

"THE COURT:  We don't have the homicidal act Instruction for Number 16 with Leah Brown.

"[DEFENSE COUNSEL]:  We are not supposed to. The State's theory is that it was intentionally to kill Colwin Henderson, and that it did actually kill Colwin

14

Henderson. There is no theory that it was a bullet aimed for somebody else. There is no lesser included, so the State's theory is that they were never—Mr. Roberts was never intending to strike [Brown]. He was only intending to strike Colwin Henderson, and so they have to prove that for the second degree murder. A separate instruction is not necessary."

The State relies on defense counsel's statements during and after the instruction conference to claim that the doctrine of invited error precludes review of Roberts' alleged instructional error. The invited error doctrine dictates that "'a litigant who invites and leads a trial court into error will not be heard on appeal to complain of that action.'" *Fleming*, 308 Kan. at 696. In the context of jury instructions, there is no bright-line rule for its application. Rather, to determine whether the doctrine bars consideration of the alleged error, appellate courts must carefully examine the complaining party's actions that allegedly induced the court to make the claimed error and the context in which those actions occurred. See 308 Kan. at 702 (explaining that "the nature of the error . . . and the circumstances surrounding the drafting of instructions" are critical to an invited-error analysis). A mere failure to request an instruction does not trigger invited error. But "when a defendant actively pursues what is later argued to be an error, then the doctrine most certainly applies." *State v. Sasser*, 305 Kan. 1231, 1236, 391 P.3d 698 (2017).

We recently harmonized our caselaw on jury instruction invited error in *State v. Douglas*, 313 Kan. 704, 707-08, 490 P.3d 34 (2021). In *Douglas*, the issue was whether defense counsel's statement during the jury instruction conference that "'I am not requesting any lesser included offenses'" was a mere failure to request an instruction, which does not trigger invited error, or something more. 313 Kan. at 707. In analyzing this issue, we found "the doctrine's application turns on whether the instruction would have been given—or omitted—but for an affirmative request to the court for that outcome later challenged on appeal. . . . The ultimate question is whether the record

15

reflects the defense's action *in fact induced* the court to make the claimed error." 313 Kan. at 708. We then turned to the record:

> "The court simply asked defense counsel, 'Do you believe any lesser included offenses are applicable or are you requesting any?' Counsel replied: 'I know that I am not requesting any lesser included offenses and indeed there may not be any applicable ones either.' The State then confirmed it was not asking for any lesser included instructions, and the court ruled, 'Based on the facts that we have today, I do not believe that there is any applicable lesser [included offenses], so I concur with your comments.'" 313 Kan. at 707-08.

We found the facts in *Douglas* failed to show that defense counsel induced the district court to refrain from giving the lesser included offense instructions. 313 Kan. at 709.

Likewise, the facts here do not show the district court would have given the voluntary manslaughter felony-murder instructions absent defense counsel's statements. During the instruction conference, defense counsel merely failed to request the alternative felony-murder instructions.

We conclude defense counsel's statements did not induce the district court to refrain from giving a voluntary manslaughter felony-murder instruction. For these reasons, Roberts did not invite the claimed error. See *Douglas*, 313 Kan. at 707-08 (invited instructional error question turns on whether the record reflects the defense's action in fact induced the court to make the claimed error).

*Step two: instructional error*

At the second step, we consider whether the voluntary manslaughter felony-murder instruction would have been legally and factually appropriate. We first address

the legal propriety of the instruction proposed by Roberts because, if an instruction is not legally appropriate, there is no error in failing to give it and the analysis ends. See *State v. Broxton*, 311 Kan. 357, 363, 461 P.3d 54 (2020).

Roberts argues the district court erred in failing to instruct the jury on voluntary manslaughter as an additional underlying felony of felony murder. Because the State did not charge Roberts with voluntary manslaughter, however, a felony-murder instruction based on voluntary manslaughter was not legally appropriate in this case. Kansas law allows the State to charge a defendant in several counts of a complaint or information for "the same offense committed in different ways or by different means to the extent necessary to provide for every possible contingency in the evidence." *State v. Saylor*, 228 Kan. 498, 503-04, 618 P.2d 1166 (1980) (prosecutor may charge defendant in the alternative under those subsections of same statute "which may possibly be established by the evidence"). Here, the State charged Roberts with intentional second-degree murder of Henderson and a single count of felony murder for each victim, alleging the intentional second-degree murder of Henderson as the sole underlying felony. Although the State elected to charge Roberts only with intentional second-degree murder, the court instructed on the lesser included offense of voluntary manslaughter for the jury to consider in case it did not unanimously agree that Roberts was guilty of second-degree murder. But instructing on a lesser included offense of the underlying crime charged does not make that lesser included offense a legally appropriate underlying crime in a felony-murder instruction.

Roberts' confusion on this issue appears to stem from the fact that voluntary manslaughter is one of the crimes expressly designated by statute as an inherently dangerous felony. But the State did not charge Roberts with any alternative counts of felony murder or otherwise amend the complaint at any time during trial or before the jury's verdict to include voluntary manslaughter as an alternative underlying felony. See

17

K.S.A. 2020 Supp. 21-5402(c)(2)(C). Thus, the court could instruct the jury only on felony murder with intentional second-degree murder as the underlying felony. See *Stirone v. United States*, 361 U.S. 212, 217, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960) ("[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him."); *State v. Haberlein*, 296 Kan. 195, 210, 290 P.3d 640 (2012) ("The State is bound by the wording of its complaint and limits itself to pursue only that 'version of the offense' or 'theory' of the case at trial."). If the district court had instructed the jury that it could convict Roberts of felony murder with voluntary manslaughter as the underlying felony, Roberts could have argued that the instruction was overbroad. See *State v. Hart*, 297 Kan. 494, 508, 301 P.3d 1279 (2013) ("An overbroad instruction is erroneous because the charging instrument sets out the specific offense alleged to inform the defendant of the nature of the accusation, to permit the development of a defense to meet that accusation, and to protect against conviction based on facts not contemplated in the accusation."); *State v. Trautloff*, 289 Kan. 793, 802, 217 P.3d 15 (2009) ("A jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous.").

Roberts' claim of jury confusion based on its ability to consider lesser included offenses for the crime of intentional second-degree murder alleged in count 3 of the complaint is equally unavailing. Appellate courts consider "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.' [Citation omitted.]" *State v. Butler*, 307 Kan. 831, 843, 416 P.3d 116 (2018). That the court instructed the jury on lesser-included offenses of intentional second-degree murder related to count 3 is irrelevant to the felony-murder charges in counts 1 and 2. Indeed, the court instructed the jury to consider each count separately, independent of its decision on any other charge:

18

"Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged."

We presume the jury followed the instructions given by the district court. See *State v. Hachmeister*, 311 Kan. 504, 513, 464 P.3d 947 (2020).

The district court's instructions on felony murder properly stated the law and reflected the charges set forth in the complaint. And the voluntary manslaughter felony-murder instruction proposed by Roberts on appeal was not legally appropriate. Because we find no instructional error, there is no need to address factual appropriateness or reversibility.

2. *Sufficiency of the evidence*

Roberts challenges the sufficiency of the evidence to support his convictions. Roberts alleges the State failed to establish that he intentionally killed Henderson, an element required to prove all four of his convictions. Our standard of review for this issue is well known:

"'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational fact[-]finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

In count 3 of the complaint, the State charged Roberts with the intentional second-degree murder of Henderson. Counts 1 and 2 charged Roberts with felony murder of

Brown and Dean based on the underlying felony of the intentional second-degree murder of Henderson. And count 4 of the complaint charged Roberts with attempted intentional second-degree murder of Tahzay Rayton based on Roberts' intent to kill Henderson. Thus, Roberts' convictions each turn on sufficient proof of his intent to kill Henderson.

Second-degree murder, as relevant here, is defined as "the killing of a human being committed: (1) [i]ntentionally." K.S.A. 2020 Supp. 21-5403(a). "A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result." K.S.A. 2020 Supp. 21-5202(h). The district court instructed the jury accordingly, requiring the State to prove that Roberts acted with the conscious objective or desire to kill Henderson to obtain a conviction on each charge.

"Intent is difficult, if not impossible, to show by definite and substantive proof. Thus, it is agreed that criminal intent may be shown by proof of the acts and conduct of the accused, and inferences reasonably drawn therefrom." *State v. Woods*, 222 Kan. 179, 185, 563 P.2d 1061 (1977). In making those inferences, the jury presumes that a person intends all the natural consequences of his or her acts. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Intent can be, and usually is, inferred from circumstantial evidence. *State v. Thach*, 305 Kan. 72, 83-84, 378 P.3d 522 (2016). Circumstantial evidence, to be sufficient, need not exclude every other reasonable conclusion. And a conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). It is the jury's prerogative to determine the weight to give the evidence and the reasonable inferences drawn from that evidence. *State v. Gibson*, 246 Kan. 298, 303, 787 P.2d 1176 (1990).

20

To establish proof of Roberts' intent to kill Henderson, the State introduced evidence that their groups of friends did not get along and that there were "hard feelings" between them. Roberts himself admitted that he did not get along with Henderson's group of friends. The State also introduced evidence that the animosity between the two groups was triggered by a fight between Brown and Richardson before the concert at the Granada, and that Brown went back to Topeka and later returned to Lawrence with Roberts and their friends.

Roberts suggests that the evidence cited above is weak and insufficient to support a finding that he intended to kill Henderson. Contrary to Roberts' assertion, however, this evidence provides a motive for Roberts' alleged actions. And evidence of motive may support proof of intent:

> "Motive supplies the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State. Often it is a prominent feature of the State's theory of its case. Motive makes some sense out of what otherwise appear to be completely senseless crimes." *State v. Engelhardt*, 280 Kan. 113, 128, 119 P.3d 1148 (2005).

The State also presented evidence that Roberts waved his gun and said, "'What's poppin'?'" to Wheeler and Henderson, which the jury could have viewed as a display of aggression. Roberts also testified that he followed Wheeler and Henderson after revealing that he was armed. And Hugghis testified that Roberts admitted to shooting Henderson and firing his gun until he saw Henderson fall.

Roberts challenges the State's theory that he went to Lawrence armed with a gun in response to Brown's fight, claiming that he had decided to go well before then and that he always carried his gun. Roberts also asserts that his actions upon arrival in Lawrence did not support an intent to kill Henderson. For support, Roberts implies that he could

21

have shot Henderson from other locations with no witnesses but instead chose to make his presence known to Henderson and his group without making any statements or gestures suggesting that he intended to use his gun against them. Rather than engaging in the fight that broke out among the group, Roberts maintains that he merely reacted to the fight by firing his gun without looking in any direction. Roberts observes that people who were not immediately near Henderson were struck by bullets, claiming this fact demonstrates that he lacked the intent to shoot anyone in particular, including Henderson. And Roberts challenges Hugghis' testimony as evidence of intent because she did not testify that Roberts ever said that he intended to shoot Henderson. Roberts also complains that no forensic evidence established that he actually shot any of the victims.

We first note that forensic evidence is not required to sustain Roberts' convictions. See *Logsdon*, 304 Kan. at 25 (A conviction of even the gravest offense can be based entirely on circumstantial evidence.). And Roberts' remaining arguments are essentially an invitation to reweigh the evidence, which we cannot do. See *Chandler*, 307 Kan. at 668 ("'Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'"); *Gibson*, 246 Kan. at 303 (It is the jury's prerogative to determine the weight to give the evidence and the reasonable inferences drawn from it.).

Finally, Roberts suggests that the district court's decision to issue lesser included offense instructions shows that the court recognized there was a lack of evidence establishing the specific intent to kill. And he questions whether the jury's findings are even reliable "given the impossible position that the erroneous jury instructions placed the fact finders in."

We are not persuaded by Roberts' argument. The district court's decision to provide the jury with lesser included offense instructions does not mean the court

believed that evidence of intent was lacking. Rather, the court provided these instructions under K.S.A. 2020 Supp. 22-3414(3), which requires courts to instruct a jury on lesser included offenses "where there is some evidence which would reasonably justify a conviction of some lesser included crime." This duty to instruct applies even if the evidence is weak or inconclusive. *State v. Maestas*, 298 Kan. 765, 778-79, 316 P.3d 724 (2014). Providing lesser included offense instructions allows a jury to consider the full range of possible verdicts supported by the evidence.

Viewing the evidence outlined above in the light most favorable to the State, there is sufficient evidence for the jury to find beyond a reasonable doubt that Roberts had the conscious objective or desire to kill Henderson. See K.S.A. 2020 Supp. 21-5202(h).

Affirmed.