NOT DESIGNATED FOR PUBLICATION

No. 126,840

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ADAM MADRIGAL,
*Appellant.*

MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Submitted without oral argument. Opinion filed July 25, 2025. Affirmed.

*Sean P. Randall*, Kansas Appellate Defender Office, for appellant.

*Ashley McGee*, assistant county attorney, *Marc Goodman*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before MALONE, P.J., SCHROEDER and GARDNER, JJ.

PER CURIAM: Adam Madrigal appeals his conviction for driving under the influence of drugs, arguing his conviction must be overturned because of an erroneous jury instruction and insufficient evidence to support his conviction. After careful review, we affirm Madrigal's conviction.

1

*Factual and Procedural Background*

On September 7 and into the early morning hours of September 8, 2020, Madrigal worked his standard "third shift" at an Emporia warehouse. He got off work around 7:30 a.m., went home, and cleared brush from his property. After a few hours, he loaded the debris into his truck bed and drove to the waste transfer station to drop off the yard waste.

Paul James was also going to the transfer station and happened to be behind Madrigal on the way there. According to James, while on the Prairie Street bridge, he saw the passenger side tires of Madrigal's vehicle briefly go up onto the lip of a concrete barrier wall for approximately 10 to 15 feet before the vehicle returned to the road.

James continued behind Madrigal to the transfer station. Once Madrigal went inside, James told the transfer station employee at the front gate what he had seen. After speaking with James, that employee noticed that Madrigal's truck was parked in front of the brush pile sign, which is not how people typically park their vehicles when dumping brush. The employee testified that people typically "back up to the brush pile and dump their stuff off there, not up to the sign." She noticed he had not removed anything from the back of his truck and the vehicle was not moving, which she thought was unusual.

The employee notified her manager about what James had told her and about the parked truck, and the manager told her to call 911. While the employee was on the phone with 911, the manager and another customer approached Madrigal's truck. The manager testified that she observed Madrigal asleep at the wheel of the truck. The other customer told the manager he knew Madrigal and would help wake him. The manager testified that they woke up Madrigal, who said "that he had worked all night and was tired and had [fallen] asleep there." However, Madrigal testified that he was not asleep; he was just looking down at his phone while he waited for the dumping area to clear out. After

2

contact with the manager and other customer, Madrigal pulled forward, unloaded his brush and tree limbs, and then left.

Around 11:30 a.m., on September 8, 2020, an emergency dispatch received a report that a driver had seen another vehicle strike a concrete barrier wall and that the driver of that vehicle was possibly having a medical issue. Emporia law enforcement officers were dispatched to the area of the reported incident—the city's waste transfer station—for a welfare check. They had a description of Madrigal's truck, his license plate number, and information that he may have been involved in a collision on the Prairie Street bridge. Officer Jonathan Klaurens responded and came across a truck matching the description—a blue Chevy pickup.

Klaurens pulled up parallel to Madrigal's truck and asked for the driver's name, and the driver identified himself as Madrigal. Then Klaurens asked if Madrigal would wait there for a moment because the truck matched the description of someone who had hit the bridge. Klaurens then turned around and pulled behind Madrigal and saw that the tag matched the one given on the call. At that time Officer Justin Hill also arrived at the scene.

Based on observations discussed below, Hill asked Madrigal to submit to standardized field sobriety testing. Klaurens administered both standardized and nonstandardized field sobriety tests and found several indicators of impairment, including performing poorly on the walk-and-turn test, the one-leg stand test, and recitation of a portion of the alphabet. While Klaurens was conducting the field sobriety tests, Hill went to investigate the scene where James reported Madrigal had struck the bridge. While there, Hill observed what appeared to be tire marks veering off to the right that went up onto the concrete barrier on the bridge. Hill also had looked at Madrigal's truck and noticed what appeared to be new "small scrapes" on it.

3

Based on the markings on the bridge, the events at the transfer station, observed scrapings on Madrigal's vehicle, and the observations of impairment during the field sobriety tests, the officers believed Madrigal was impaired. Klaurens administered a preliminary breath test to detect if there was any alcohol in Madrigal's system, which showed a result of 0.00 breath alcohol concentration. The officers believed Madrigal was impaired due to the prescription drug bottles they had seen in the center console, and requested Madrigal submit to a blood draw, to which he agreed. The officers took Madrigal to the local hospital where a blood draw was performed. That blood sample was then sent to the Kansas Bureau of Investigation (KBI) for testing.

Madrigal was later charged with DUI. He testified in his own defense. He admitted that he did swerve a bit on the bridge because he hit a bump, which made the tailgate of his truck unlatch, and he over corrected from that. But he denied hitting the concrete side barrier of the bridge and testified the marks were on his truck when he bought it. He stated that during his encounter with the officers he was very physically tired because he had worked overnight at his warehouse job and then cleared brush and limbs after work without sleeping.

He added that the prescription bottles officers found in the center console of his vehicle were Adderall, Ambien, and Xanax. He said that he takes the Adderall and Xanax before his shift, but not the Ambien because it makes him very drowsy and he only takes it just before going to bed. He stated the other two prescriptions do not negatively affect his ability to function. He denied taking the Ambien that day.

The jury found Madrigal guilty of one count of driving under the influence of a drug or combination of drugs. This was his third driving under the influence offense within ten years. The district court sentenced Madrigal to 2,160 hours of house arrest, followed by 1 year of postrelease supervision.

Madrigal timely appeals.

*Did the district court erroneously instruct the jury on the presence of drugs in Madrigal's system?*

First, Madrigal argues that jury instruction No. 10 misstated the law and was legally inappropriate, resulting in clear error. He argues that evidence of impairment under K.S.A. 8-1005(c) must include the level of concentration of the drug, not just the presence of the drug, yet jury instruction No. 10 failed to state the concentration of the drug, as is necessary before the jury can consider a positive blood test.

In response, the State argues that invited error prevents this panel from considering this issue. In the alternative, the State argues that "concentration" in K.S.A. 8-1005 refers only to alcohol concentration and not to drug concentration, so the jury instruction was legally appropriate.

*Invited Error*

We first address the State's argument that invited error prevents us from considering this issue. Whether the doctrine of invited error applies is a question of law subject to unlimited review. *State v. Stoll*, 312 Kan. 726, 735, 480 P.3d 158 (2021).

Madrigal's counsel filed proposed jury instructions in November 2022. Those proposed instructions included jury instruction No. 10 but had additional clarifying language. We show a side-by-side comparison of the requested instruction and the given instruction (jury instruction No. 10), with the added language italicized.

| Requested Instruction | Given Instruction |
|---|---|
| "If a test of the Defendant's bodily substance shows the presence of a narcotic, hypnotic, somnifacient, stimulating or other drug which has the capacity to render the Defendant incapable of safely driving a vehicle, you may consider that fact along with other competent evidence to determine whether the Defendant was under the influence of drugs to a degree that he was rendered incapable of driving safely.<br><br>"*The mere presence of drugs in the Defendant's blood does not, by itself, conclusively establish that the Defendant was under the influence of such drugs to a degree that he was rendered incapable of driving safely.*<br><br>"You are further instructed that evidence derived from a blood test does not reduce the weight of any other evidence on the question of whether the Defendant was under the influence of *drugs to a degree that he was rendered incapable of driving safely.*" | "If a test of the defendant's blood shows the presence of a narcotic, hypnotic, somnifacient, stimulating or other drug which has the capacity to render the defendant incapable of safely driving a vehicle, you may consider that fact along with other competent evidence to determine whether the defendant was under the influence of drugs to a degree that he was rendered incapable of driving safely.<br><br>"You are further instructed that evidence derived from a blood test does not reduce the weight of any other evidence on the question of whether the defendant was under the influence of drugs or a combination of alcohol and drugs." |

Before trial, Madrigal requested and received new appointed counsel who filed no additional instructions. During the instructions conference, the district court reviewed the jury instructions filed by both parties, noted that the instructions were PIK instructions, and stated there appeared to be no disagreement between the two sets of instructions. The district court then stated which instructions it intended to give, including instruction 10. Madrigal's counsel stated he had no objections to the district court's instructions and had no additions to them. The instructions were read to the jury without objection.

A litigant may not invite an error and then complain of that error on appeal. *State v. Green*, 315 Kan. 178, 183, 505 P.3d 377 (2022). There is no bright-line rule for applying the invited error doctrine. *State v. Douglas*, 313 Kan. 704, 707, 490 P.3d 34 (2021). "The doctrine of invited error precludes a party from asking a district court to rule in a given way and then challenging that ruling on appeal." 313 Kan. 704, Syl. ¶ 1. In the context of jury instructions, the ultimate question is whether the record shows that the defense's action induced the court to make the claimed error. *State v. Roberts*, 314 Kan. 835, 846, 503 P.3d 227 (2022); see *Douglas*, 313 Kan. at 708-09. So when a defendant actively pursues what is later argued to be an error, the doctrine applies. See *State v. Angelo*, 287 Kan. 262, 279-80, 197 P.3d 337 (2008) (applying doctrine when defendant affirmatively requested no lesser included offense instructions because defense strategy was "all-or-nothing").

But, to trigger application of the invited error doctrine, a party must do more than merely fail to object to a proposed jury instruction at an instructions conference. See *State v. Walker*, 304 Kan. 441, 445, 372 P.3d 1147 (2016) (invited error would not bar defendant from raising lesser included offense issue on appeal when counsel did not request instructions pretrial and confirmed that was still the case at the instructions conference); *State v. Dern*, 303 Kan. 384, 398, 362 P.3d 566 (2015) (declining to apply invited error when defendant did not object to, or request, the challenged instruction). Mere acquiesce in the court's later-claimed error does not invite error. See *State v. Soto*, 301 Kan. 969, 984, 349 P.3d 1256 (2015) (declining to apply invited error doctrine when counsel merely acquiesced in a ruling that the facts did not justify a lesser included offense instruction after court initially proposed it); *State v. Lewis*, 299 Kan. 828, 855, 326 P.3d 387 (2014) (declining to apply invited error when defendant acquiesced to jury question response).

We find the invited error doctrine inapplicable. Although Madrigal did not object to the given instruction, he also did not request it. Instruction No. 10 materially differs

from the instruction his counsel proposed. True, much of the language is the same, but significant additional language in the proposed instruction was omitted from the given instruction. Madrigal's new counsel's failure to object or request additions at the instruction conference is acquiescence rather than inducement. See *Lewis*, 299 Kan. at 855. And acquiescence is not enough to satisfy the invited error doctrine.

*Step One: Preservation*

We thus reach the merits of Madrigal's jury instruction argument. Appellate courts use a three-step analysis when assessing a claimed jury instruction error. If a party fails to meet the test under any of the three steps, the court's analysis ends there. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Under the first step, the court determines "whether the issue is reviewable—that is, whether there is appellate jurisdiction and whether the issue is sufficiently preserved for our review." *State v. Ervin*, 320 Kan. 287, 293-94, 566 P.3d 481 (2025) (citing *McLinn*, 307 Kan. at 317). Under the second step, the court analyzes whether the instruction is legally and factually appropriate, which involves a merits determination of whether there was error. Under the third step, the court examines whether the jury's verdict should be reversed. 320 Kan. at 294.Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step of the test. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021).

Madrigal did not object to the jury instruction that he now claims was erroneous. We thus review the instruction to determine whether it was clearly erroneous. K.S.A. 22-3414(3). But we must first determine whether the instruction was legally and factually appropriate. See *Ervin*, 320 Kan. at 294.

*Step Two: Legal and Factual Appropriateness*

We apply an unlimited review to determine whether the instruction was legally and factually appropriate. *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023). Madrigal makes no challenge to the factual appropriateness of jury instruction No. 10, thus waiving that potential claim of error. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (holding an issue not briefed is deemed waived or abandoned).

Madrigal argues that the instruction was legally inappropriate because it did not accurately reflect the law. "[A]n instruction must always fairly and accurately state the applicable law, and an instruction that does not do so would be legally infirm." *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). Madrigal contends that the statute that instruction No. 10 is based on (K.S.A. 8-1005) requires evidence of the concentration of drugs in his blood but the instruction failed to include that requirement, making it legally inappropriate.

K.S.A. 8-1005 states, in relevant part:

"[I]n any criminal prosecution for violation of the laws of this state relating to operating or attempting to operate a vehicle while under the influence of alcohol or drugs, or both . . . *evidence of the concentration of alcohol or drugs in the defendant's blood*, urine, breath or other bodily substance may be admitted and shall give rise to the following:

. . . .

"(c) If there was present in the defendant's bodily substance any narcotic, hypnotic, somnifacient, stimulating or other drug which has the capacity to render the defendant incapable of safely driving a vehicle, that fact may be considered to determine if the defendant was under the influence of drugs, or both alcohol and drugs, to a degree that renders the defendant incapable of driving safely." (Emphasis added.)

Madrigal argues that the italicized language creates a prerequisite to the consideration of any blood evidence.

Resolution of Madrigal's argument requires statutory interpretation, over which our review is unlimited. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. We first try to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022).

Madrigal asserts that the plain language of K.S.A. 8-1005 requires admissible drug testing evidence to contain concentration levels of alcohol and drugs. Yet this argument ignores a small, but important, word—"or." The statute states "evidence of the concentration of alcohol *or* drugs in the defendant's blood, urine, breath or other bodily substance may be admitted." K.S.A. 8-1005. (Emphasis added.) Madrigal reads the modifying phrase "concentration of" to apply to both alcohol and drugs.

We find some guidance in other parts of K.S.A. 8-1005:

"(a) If the *alcohol concentration* is less than .08, that fact may be considered with other competent evidence to determine if the defendant was under the influence of alcohol, or both alcohol and drugs.

"(b) If the *alcohol concentration* is .08 or more, it shall be prima facie evidence that the defendant was under the influence of alcohol to a degree that renders the person incapable of driving safely.

"(c) If there was present in the defendant's bodily substance any narcotic, hypnotic, somnifacient, stimulating or other drug which has the capacity to render the

10

defendant incapable of safely driving a vehicle, that fact may be considered to determine if the defendant was under the influence of drugs, or both alcohol and drugs, to a degree that renders the defendant incapable of driving safely." (Emphasis added.)

K.S.A. 8-1005(a) and (b) make clear that evidence relating to a defendant driving under the influence of alcohol requires a concentration amount. Both subsections refer to "alcohol concentration," but (c) contains no mention of "drug concentration" or even "concentration."

We also look to the applicable definitions section for this statute. K.S.A. 8-1013(a) defines "alcohol concentration" as "the number of grams of alcohol per 100 milliliters of blood or per 210 liters of breath" but contains no definition of "drug concentration." See generally K.S.A. 8-1013.

K.S.A. 2024 Supp. 8-1567 suggests that same conclusion—that the jury may consider the presence in defendant's body of any drug that has the capacity to render him incapable of safely driving a vehicle. That section provides five ways for the State to prove DUI:

"(a) Driving under the influence is operating or attempting to operate any vehicle within this state while:

(1) The *alcohol concentration* in the person's blood or breath as shown by any competent evidence, including other competent evidence, as defined in K.S.A. 8-1013(f)(1), and amendments thereto, is 0.08 or more;

(2) the *alcohol concentration* in the person's blood or breath, as measured within three hours of the time of operating or attempting to operate a vehicle, is 0.08 or more;

(3) under the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle;

(4) under the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle; or

11

(5) under the influence of a combination of alcohol and any drug or drugs to a degree that renders the person incapable of safely driving a vehicle." (Emphasis added.) K.S.A. 2024 Supp. 8-1567(a)(1)-(5).

Two of the four ways to prove DUI from alcohol require proof of "alcohol concentration," see K.S.A. 8-1567(a)(1), (2); but neither way of proving DUI from drugs requires proof of drug concentration, see K.S.A. 8-1567(a)(4), (5). To the contrary, it is sufficient that the state prove that a person is "under the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle." K.S.A. 2024 Supp. 8-1567(a)(4).

Madrigal's argument invites this court to read words into the statute that are not there. But we must refrain from doing so. *Keys*, 315 Kan. at 698. The Legislature has shown that if it wanted to require evidence of drug concentration levels rather than evidence of drug presence, it knew how to do so. Still, in some subsections it requires "alcohol concentration," but in another it requires only a positive presence. Compare K.S.A. 2024 Supp. 8-1567(a)(1), (2) with K.S.A. 8-1567(a)(3).

A careful reading of K.S.A. 8-1005 indicates that a test with a positive result for a drug (but without concentration levels of that drug) that has the capacity to render the defendant incapable of safely driving a vehicle may be considered when determining whether the defendant was under the influence of drugs "to a degree that renders the defendant incapable of driving safely." Because jury instruction No. 10 was legally appropriate, and Madrigal does not challenge its factual appropriateness, our analysis ends here. See *McLinn*, 307 Kan. at 317. We find no error in giving jury instruction No. 10.

12

*Does sufficient evidence support Madrigal's conviction for driving under the influence of drugs?*

Madrigal also contends that his conviction for driving under the influence of drugs was not supported by sufficient evidence. He argues that the State provided no evidence of a causal link between the presence of the prescription drugs in his system and his alleged inability to drive safely. He asserts that testimony about how those drugs may affect a person generally fails to prove how those drugs affected him. The State counters that it showed a causal connection by circumstantial evidence.

*Standard of Review and Legal Maxims*

An appellate court reviews a challenge to the sufficiency of evidence supporting a criminal conviction "'in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Hambright*, 318 Kan. 603, 606, 545 P.3d 605 (2024) (quoting *State v. Buchanan*, 317 Kan. 443, 454, 531 P.3d 1198 [2023]). "This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

A verdict may be supported by circumstantial evidence, if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Circumstantial evidence, to be sufficient, need not exclude every other reasonable conclusion. *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021). A conviction of even the gravest offense can be based entirely on circumstantial evidence. *State v. Pattillo*, 311 Kan. 995, 1003, 469 P.3d 1250 (2020). There is no legal distinction between direct and circumstantial evidence in terms of their respective probative value. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

13

Appellate courts "are not to '"reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations."'" *Meggerson*, 312 Kan. at 247.

*Applicable Facts*

We summarize the trial testimony. Three witnesses testified to Madrigal's behavior before law enforcement contacted him. James testified that he observed Madrigal's truck strike a bridge wall barrier and then continued to drive off the road slightly onto the gravel twice. An employee at the waste transfer station testified she observed Madrigal's vehicle parked in an unusual spot contrary to the posted signs and that it remained for an unusual amount of time. A third witness testified she observed Madrigal asleep behind the wheel while parked, which caused her to believe he was impaired and a danger to the other people on the roads.

Law enforcement officers also testified to their observations of Madrigal. Klaurens noted upon first speaking with Madrigal that he was slow to respond and continued to look for his license even though he said he had lost it. Klaurens testified this mattered to him as it was an indicator of impairment. While Madrigal was looking for his license, Klaurens saw prescription pill bottles inside Madrigal's vehicle.

Klaurens testified he had received training regarding DUI investigations, which included drug-related investigations. He had no specialized training for drug-related investigations beyond the use of standardized field sobriety testing, but he testified that the field sobriety tests applied to both alcohol and drug investigations to assess a driver's impairment. He stated he saw limited signs of impairment upon his initial contact with Madrigal and planned to allow Madrigal to leave the scene. But when Madrigal was walking back to his truck, officers saw that Madrigal was leaning on his vehicle to hold himself up.

14

Although at first Hill treated the stop as a welfare check, Hill testified that Madrigal's confusions became significant as a possible indicator of impairment when he saw Madrigal walking back toward his vehicle, having a hard time keeping his balance. At that time, the welfare stop transformed into an investigatory detention for driving under the influence. Hill asked Madrigal if he would take the standardized field sobriety tests because he believed they are appropriately used to measure if a person is impaired. Hill explained that the standardized field sobriety tests are "divided attention tests" that can not only assess someone's cognitive function, but also their ability to balance. Madrigal agreed to take the tests.

Klaurens administered the field sobriety tests. During these tests, Klaurens observed five of the eight clues of impairment on the "walk and turn" test. Klaurens found it a significant indicator of impairment that Madrigal had miscounted his steps during that test. Klaurens observed two of four clues of impairment on the "one leg stand" test and found it a significant indicator of impairment that Madrigal had put his foot down many times during that test. Klaurens also had Madrigal perform non-standardized field sobriety testing, such as saying the alphabet because most people know how to recite it. He asked Madrigal to start at "D" and stop at "Q," but Madrigal continued past "Q" all the way to "V," skipped "W," and then finished to "Z." Klaurens testified this was a significant indicator of impairment. Klaurens did not notice any odor of alcohol coming from Madrigal so, based on his observations, he believed the prescription pills were the cause of Madrigal's impairment.

Hill testified that Madrigal appeared to be very tired and that Madrigal had advised Hill that he takes medication to help him sleep. Hill testified that Madrigal stated he usually takes his medication in the morning but said he had not taken it that morning. Hill found Madrigal to be confused about the time of day and his location because Madrigal stated he thought it was either 9 or 10 a.m. when it was around 11:30 a.m. Hill

15

asked Madrigal where he believed he was, and Madrigal replied he thought he was at the intersection north of their location.

Hill did not smell any alcohol on Madrigal. Like Klaurens, Hill testified he had received very little training regarding drug-related DUI investigations, so it took him longer to consider a drug DUI. While Klaurens performed the field sobriety tests, Hill went to investigate the scene where James reported having seen Madrigal strike the side wall of the bridge. Hill testified that he saw what looked like a new scrape on Madrigal's vehicle and tire marks veering off to the right and going up the bridge's concrete barrier. Hill found this information consistent with the information that dispatch had relayed. Hill observed no mechanical issues with Madrigal's vehicle, and no adverse weather, road, or surface conditions that could explain why Madrigal would have struck the bridge barrier.

Based on the lack of other possibilities, Hill believed Madrigal's intoxication from the drugs he had taken had impaired his ability to drive. While at the scene, Hill took photographs of the prescription pill bottles inside Madrigal's center console. Those pill bottles contained labels warning against operating vehicles while taking the medication because they could cause drowsiness.

Kayla Smith, a forensic scientist for the KBI, also testified. Her numerous trainings included training on the effects of drugs. Knowing the effects of the drugs helps her to accurately testify and educate the public about those drugs.

Smith had tested a blood sample from Madrigal because the Emporia Police Department had asked her to do so. Madrigal's blood tested positive result for alprazolam, amphetamine, and zolpidem. Based upon her training and experience, Smith provided her general opinion of their side effects. Zolpidem is commonly prescribed as Ambien, which is a "CNS depressant." This central nervous system depressant is generally prescribed as a sleep aid which will slow down the body's reaction time. Smith explained that Ambien

16

could cause slurred speech, slowed speech, exaggerated reaction time, loss of memory, and decreased motor skill coordination. Smith was aware of warnings that would accompany the prescription, including not taking the medication until the person is getting into bed, and allocating enough time to sleep for the effects of the medication to wear off.

Smith testified that alprazolam, commonly known as Xanax, is also a CNS depressant, commonly prescribed for anxiety. This medication has similar effects to Ambien, such as slowed reaction time, decreased coordination, and slowed speech. Smith testified that there would be warnings to not operate heavy machinery while taking this medication. Finally, Smith testified that amphetamine is a "CNS stimulant" that is often prescribed, known as Adderall. Smith testified to a possible interaction between these drugs—when taken together they have the potential for an additive effect, meaning an increase in the drugs' side effects.

Madrigal testified as well. Madrigal testified that he kept the pills in their individual prescription bottles in the center console of his vehicle because that is where he usually takes them for the day. He would take Adderall and Xanax before work. He was prescribed the Ambien to take whenever he was having trouble sleeping, which was usually every day. Madrigal testified he was prescribed 10 milligrams of Ambien which was "quite a bit." When he takes that prescription, he is "out" and "cannot function." Madrigal testified that it takes maybe 30 minutes for it to take effect, and he is usually asleep within 45 minutes after taking it. He testified that he was warned by his doctor that taking Xanax can cause drowsiness.

*Sufficiency of the Evidence*

Madrigal was convicted of driving under the influence of a drug that rendered him incapable of safely operating a vehicle. K.S.A. 2020 Supp. 8-1567(a)(4) ("Driving under the influence is operating or attempting to operate any vehicle within this state while . . . . under the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle.").

He argues that the State failed to introduce any evidence that Madrigal's prescription drugs caused his inability to safely drive a motor vehicle. Madrigal stresses that Klaurens and Hill admitted they lacked specialized training in impairment due to prescription drugs and that Smith testified only to the drugs' general capacity to impair a person, but not specifically to how the drugs affected Madrigal on the day in question.

Still, the jury had sufficient evidence to sustain Madrigal's conviction. "[A] DUI conviction, like any conviction, can be supported by direct or circumstantial evidence." *State v. Perkins*, 296 Kan. 162, 167, 290 P.3d 636 (2012); see *State v. Duncan*, 44 Kan. App. 2d 1029, 1034, 242 P.3d 1271 (2010) (discussing that evidence of incapacity to safely operate a vehicle can be established though sobriety tests and other means).

The jury heard from three eyewitnesses about the behavior they witnessed, the signs of impairment that Klaurens and Hill detected, and the side effects that might arise when someone takes the prescription drugs for which Madrigal tested positive.

The jury was instructed to consider all the evidence and then determine whether that evidence established that the drugs in Madrigal's system rendered him incapable of safely operating a vehicle. A jury is permitted to logically connect the evidence together and make reasonable inferences from it. See *Colson*, 312 Kan. at 750. The absence of an

18

expert witness testifying how the drugs affected Madrigal as an individual that day does not negate the jury's ability to make reasonable inferences.

Madrigal denied that his prescriptions affected him on that day in the way that Smith testified, but by pressing this point, Madrigal asks this court to reweigh the witness' credibility. The jury heard Smith's and Madrigal's testimony and gave more credit to Smith's. We cannot reweigh the testimony and reach to the opposite conclusion. See *Meggerson*, 312 Kan. at 247. See *City of Salina v. Dahl*, No. 124,122, 2022 WL 1436063, at *3 (Kan. App. 2022) (unpublished opinion).

Officers observed Madrigal's delayed reaction times, slow speech, and difficulty balancing. Eyewitnesses saw Madrigal strike a bridge then fall asleep while sitting in his car. The jury heard evidence that Madrigal's blood tested positive for alprazolam, amphetamine, and zolpidem and that these medications have side effects like those Madrigal showed. Given the lack of other causal factors, the jury made the logical inference that the prescription medications that Madrigal had taken caused his inability to safely operate his vehicle that day.

We find sufficient evidence to support Madrigal's conviction for driving under the influence.

Affirmed.